No. 2-09-0282        Filed: 3-30-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | |
|---|---|
| MARK BOHNE, SUSAN BOHNE, EUGENE BOHNE, DORIS FLETCHER, ROBERT CUNDIFF, JUANITA CUNDIFF, IRMGARD HAUSER, LOURETTA NASH, JULIE MORGAN, ROBERT BELLUOMINI, RICHARD GENZ, and GERALDINE GENZ, | Appeal from the Circuit Court of Kane County. |
| Plaintiffs-Appellees and Cross-Appellants, | |
| v. | No. 05--MR--273 |
| La SALLE NATIONAL BANK, as Trustee Under Trust No. 39201, and WILLIAM DWYER, | |
| Defendants-Appellants and Cross-Appellees | |
| | Honorable |
| (Kevin Hauser and Richard Reuter, Plaintiffs; Dorothy Dwyer, Defendant). | Michael J. Colwell, Judge, Presiding. |

PRESIDING JUSTICE ZENOFF delivered the opinion of the court:

In July 2005, plaintiffs, Mark Bohne, Susan Bohne, Eugene Bohne, Doris Fletcher, Robert

Cundiff, Juanita Cundiff, Kevin Hauser, Louretta Nash, Julie Morgan, Richard Reuter, Robert

Belluomini, Richard Genz, and Geraldine Genz,[1] filed a multicount complaint against defendants,

---

[1]Plaintiff Kevin Hauser was subsequently dismissed from the case and his mother, Irmgard

Hauser, joined in his place.  Plaintiff Richard Reuter was also dismissed from the case after he sold

La Salle National Bank, William Dwyer, and Dorothy Dwyer,[2] seeking a declaration of plaintiffs' rights to use a quarry, located on property held in trust by La Salle National Bank (La Salle) for the benefit of William Dwyer (Dwyer). Following a bench trial, the trial court entered judgment for defendants on eight of plaintiffs' counts. On one count, the trial court entered a declaratory judgment in favor of plaintiffs, stating that plaintiffs and their successors-in-interest have the right to use all of the surface waters of the quarry for recreational purposes and that defendants do not have the right to unreasonably interfere with plaintiffs' use of the quarry. Defendants appeal from the judgment in favor of plaintiffs, and plaintiffs cross-appeal from the judgment in favor of defendants. For the reasons that follow, we affirm.

## I. BACKGROUND

Due to the voluminous nature of the record, we recite here only those facts necessary for a basic understanding of the case and the issues addressed in this decision. Any other facts necessary to the disposition of the issues will be discussed as required.

## A. Quarry History

Many of the relevant facts of this case are undisputed. In 1925, Paul Froetscher and Frank Casurella platted the Fox River Beach Subdivision in South Elgin, Illinois. Lot 55 of the subdivision consisted mostly of a former limestone quarry that had been allowed to fill with water. Lot 55 was surrounded by residential lots. Froetscher and Casurella marketed the subdivision as a resort community with a clubhouse and other amenities, and they

_____

his property on the quarry.

[2]Defendant Dorothy Dwyer was voluntarily dismissed from the case by plaintiffs prior to trial.

advertised that the purchase of a residential lot included a free undivided interest in the "Mammoth Swimming Pool," i.e., the quarry, for recreational activities such as swimming, boating, fishing, and skating. While not all of the amenities of the full resort community that Froestcher and Casurella envisioned were realized, over the years all of the residential lots surrounding lot 55 were purchased, including those quarryside lots owned by plaintiffs at the time of trial.

From the late 1920s until approximately 2005, people who owned property in the subdivision, including property not located directly on the quarry, regularly used the quarry for recreational purposes. Some of the owners with property on the quarry made improvements to their properties to facilitate their access to and use of the quarry. With respect to plaintiffs specifically, the Hausers improved their property by constructing a pier and installing a cement retaining wall and stairs along the quarry; the Fletchers installed stairs, laid a cement slab, and put in sand and gravel; Morgan floated a raft in the quarry near her property; the Cundiffs put pea gravel in the shallow water along their property, cleaned debris out of the water, and put copper sulfate in the water to get rid of algae and seaweed; the Bohnes put in a new retaining wall and added a cantilever deck; Belluomini installed retaining bricks, a waterfall, and a sand beach; and Nash put in sand and several piers. All plaintiffs believed they had the right to use the quarry for recreational purposes, based upon their and others' past use of the quarry, although none of plaintiffs' deeds to their properties contained any language expressly granting them rights to use the quarry.

In 1950, Dwyer's father, Frank, owned lot 7, which was located on the west side of the quarry, and Froetscher held title to lot 55. (Froetscher actually owned only an undivided

one-half interest in lot 55. The last known owner of the other one-half interest was Casurella. The current status of Casurella's interest is unknown.) On May 1, 1950, Frank and Froetscher executed an agreement under which Frank would be permitted to utilize lot 55 in his operation of a public bathing beach on lot 7. Through lot 7, members of the public would be permitted to access lot 55 for swimming in exchange for paying an admission fee. Paragraph 4 of the agreement, however, provided:

"All persons owning lots in said Fox River Beach Subdivision shall be admitted to said Lot 7 for the purpose of exercising such right and privilege of ingress and egress to and from said Lot 55 and the Quarry without charge, but no fishing privileges are to be extended to any such persons, with exception of second parties, in connection with their right of ingress and egress, as herein provided."

Although the original term of the 1950 agreement was for only a little over one year, Frank and Froetscher subsequently extended the term of the agreement until May 1958.

On May 1, 1958, Frank and Froetscher's wife, Elsa (Froetscher died in 1957), entered into another agreement under which Frank would be permitted to utilize lot 55 in his operation of a public bathing beach on lot 7 until October 1968. This agreement contained the same paragraph 4 as the 1950 agreement.

On June 19, 1969, Frank and Elsa executed a contract in which Elsa sold lots 24 and 55 to Frank. Included in that contract was a provision that provided: "This property is subject to the rights of other property owners of said subdivision for bathing, swimming and fishing for said Lot 55, Block 3, aforesaid." On the same day, Elsa executed a deed to lots 24 and 55, which stated that it was "[s]ubject to the conditions contained in the Real

Estate Contract Dated 19th day of June, A.D., 1969." Before selling lot 55 to Frank, Elsa told her daughter that when she sold lot 55, she wanted to make certain that the subdivision property owners' "water rights" in the quarry were protected. Soon after the Bohnes purchased their property on the quarry in 1971, Elsa told the Bohnes that when she sold lot 55 to Frank, she wanted to preserve forever the rights of the subdivision property owners to use the quarry. The public concession on lot 7 ceased operations in the 1970s.

Following his purchase of lot 55, Frank put the lot into a trust with La Salle, of which he was the sole beneficiary. When Frank's health began to fail, Dwyer was added as a co-beneficiary of the trust. Upon Frank's death in 2000, Dwyer became the sole beneficiary.

From the 1980s through 2005, Dwyer distributed to people who owned property on the quarry rules and regulations regarding its use. Following the drowning of a trespasser in the quarry in 1997, Dwyer's concern over the safety of the quarry and his potential liability increased. Dwyer requested that the owners of property along the quarry erect fences to prevent trespassers from accessing the quarry. While many of the property owners complied, the Nottolinis, owners of a lot on the quarry, did not. In response to the Nottolinis' failure to erect a fence on their lot, Dwyer erected a fence between the quarry and the Nottolinis' lot, thereby denying the Nottolinis access to the quarry.

In July 1999, the Nottolinis filed a complaint in the trial court, seeking a declaration that because they owned a portion of the quarry bed, they had riparian rights entitling them to the reasonable use and enjoyment of the surface waters of the entire quarry. ("The term 'riparian rights' refers, in general, to the rights of an owner of land that borders on a body of water or watercourse to the use of the water." Alderson v. Fatlan, 231 Ill. 2d 311,

318 (2008).)  Under the case of <u>Beacham v. Lake Zurich Property Owners Ass'n</u>, 123 Ill. 2d 227, 232 (1988), people who own a portion of a lake bed are entitled to the reasonable use and enjoyment of the entirety of the surface waters.  The Nottolinis also sought an injunction requiring Dwyer to remove the fence and any other barriers that prevented them from using the quarry.  The trial court granted the Nottolinis the requested relief, but we reversed on appeal, holding that because the quarry was man-made, it could not be considered a lake and the Nottolinis could have no riparian rights in it.  <u>Nottolini v. La Salle National Bank</u>, 335 Ill. App. 3d 1015, 1018-19 (2003).

In 2003, Dwyer circulated a document entitled "Annual License and Permissive Use Agreement" (Permissive Use Agreement) to the owners of property surrounding the quarry.  Among other things, the Permissive Use Agreement purported to give those property owners who signed it permission to use the quarry waters for recreational purposes for a term of one year, in exchange for the property owners' naming Dwyer on their homeowners' insurance policies, indemnifying Dwyer from any liability or damages that might result from the use of the quarry, paying an annual license and assessment fee of $350, and complying with the rules and regulations set by Dwyer.  Although several property owners sent money to Dwyer to aid in insurance costs, only one property owner signed the Permissive Use Agreement.

Finally, in 2005, Dwyer informed plaintiffs that until his concerns about liability were addressed, plaintiffs would not be permitted to use the quarry.  Also in 2005, Dwyer went to the South Elgin police department and informed the police that he had liability concerns about the use of the quarry, that until his concerns were addressed he did not

want anyone using the quarry, and that he might be contacting the police to assist him in enforcing his no-trespassing policy on the quarry.

B. Current Litigation

Thereafter, in July 2005, plaintiffs instituted the present case by filing an eight-count complaint that sought declaratory and injunctive relief recognizing and protecting their claimed rights to use the quarry for recreational purposes. In support of this requested relief, count I alleged that plaintiffs were third-party beneficiaries of the 1969 sales contract between Frank and Elsa; count II alleged that plaintiffs held easements appurtenant to lot 55; count III alleged that plaintiffs held prescriptive easements for the use of lot 55; count IV alleged that plaintiffs held implied easements for the use of lot 55; counts V and VI alleged that defendants were estopped from preventing plaintiffs' use of lot 55; and count VII alleged that defendants were estopped by the doctrine of estoppel by deed from preventing plaintiffs' use of lot 55. Count VIII sought damages for defendants' alleged breach of the 1969 sales contract between Frank and Elsa.

Defendants filed a motion to dismiss plaintiffs' complaint, arguing that this court's decision in Nottolini was res judicata to the present case. The trial court agreed and dismissed plaintiffs' complaint in its entirety. Plaintiffs appealed, and we reversed. We determined that Nottolini was not res judicata to the present case because there was no identity of causes of action and no identity of parties. Bohne v. LaSalle National Bank, No. 2--05--0861 (2006) (unpublished order under Supreme Court Rule 23) (Bohne I). Accordingly, we remanded the matter for further proceedings.

On October 23, 2006, defendants filed an answer to plaintiffs' complaint, denying all of the substantive allegations of plaintiffs' complaint and again raising the affirmative defense that plaintiffs' claims were barred by res judicata based on Nottolini.

In March 2007, plaintiffs filed a motion for summary judgment on counts I, II, III, IV, and VII of their complaint. In response, defendants argued, among other things, that plaintiffs' claim of an "implied easement appurtenant" was barred by the statute of limitations set forth in section 13--118 of the Code of Civil Procedure (Code) (735 ILCS 5/13--118 (West 2006)).

Prior to the trial court's ruling on the motion for summary judgment, defendants filed a motion for leave to file amended affirmative defenses, which the trial court granted. The amended affirmative defenses, however, do not appear in the record.

On July 10, 2007, the trial court denied plaintiffs' motion for summary judgment, finding that there existed genuine issues of material fact on counts I, II, III, IV, and VII. In the same order, the trial court also determined that the statute of limitations raised by defendants did not apply.

Plaintiffs, in November 2007, filed a motion to continue trial pending the Illinois Supreme Court's decision in Alderson, 231 Ill. 2d 311. Plaintiffs contended that because Alderson presented the issue of whether riparian rights could arise in regard to a man-made quarry, the supreme court's decision could effectively overturn the rationale of Nottolini, which held that there could be no riparian rights in a man-made quarry. The trial court denied plaintiffs' motion for a continuance.

In December 2007, plaintiffs filed a motion to amend their complaint to add a count based on Beacham. The trial court granted plaintiffs' motion, and plaintiffs added count IX, alleging that because they owned portions of the quarry's lake bed, under Beacham they were entitled to use the entirety of the quarry's surface waters. Soon after, plaintiffs filed a motion to amend their complaint to add a count based upon their chains of title. The trial court granted the motion, and plaintiffs added count X, alleging that the right to use the quarry for recreational purposes had passed through their respective chains of title. In July 2008, defendants filed an answer to counts IX and X. The answer denied plaintiffs' substantive allegations and contained no affirmative defenses.

A bench trial was held from August 4, 2008, through August 13, 2008. At trial, plaintiffs presented evidence that lot 55 was not coextensive with the quarry and that the top of the quarry bank and the quarry's waterline were located within the boundaries of some of the quarryside property owners' lots. Although Dwyer testified that he believed the quarry was located entirely within the boundaries of lot 55, plaintiffs presented numerous surveys that indicated that the quarry extended onto some of the properties surrounding the quarry. In addition, Morgan, Eugene Bohne, and Mark Bohne all specifically testified that their lots extended into the quarry.

Following the presentation of plaintiffs' case, defendants moved for judgment in their favor pursuant to section 2--1110 of the Code (735 ILCS 5/2--1110 (West 2008)). The trial court granted the motion with respect to counts I, II, V, VI, VII, IX, and X of plaintiffs' complaint, but denied it as to counts III and IV. Plaintiffs voluntarily dismissed count VIII. Defendants then presented their case and the court took the matter under advisement.

Before the trial court issued its judgment, plaintiffs filed a motion to vacate the dismissal of count IX and to amend count IX to state a claim under the recently decided case of Alderson, 231 Ill. 2d 311. Plaintiffs contended that Alderson extended riparian rights to man-made bodies of water. Thus, plaintiffs argued, they were entitled to riparian rights in the quarry, despite this court's determination in Nottolini that riparian rights did not apply to artificial bodies of water. On the same day, plaintiffs moved for judgment on their proposed amended count IX. Nothing in the record suggests that defendants objected to plaintiffs' request to amend count IX.

On January 20, 2009, the trial court issued a letter order, granting plaintiffs' motion to vacate the dismissal of count IX and to amend count IX. The trial court also granted plaintiffs' motion for judgment on the amended count IX, determining that plaintiffs had riparian rights in the quarry. Accordingly, the trial court granted plaintiffs a declaratory judgment, declaring that they and their successors-in-interest had the right to use all of the surface waters of the quarry for recreational purposes, so long as they did not unreasonably interfere with the reasonable use and enjoyment of the quarry waters by other shoreline property owners, and also declaring that Dwyer did not have the right to interfere with such use of the quarry by plaintiffs.[3]

---

[3]On February 17, 2009, after the trial court had already granted judgment on the amended count IX, defendants filed a motion to dismiss the amended count IX. The trial court denied this motion on February 18, 2009. Defendants then filed an answer to the amended count IX on February 18, 2009. Neither of these filings objected to the amendment of count IX.

On February 23, 2009, the trial court entered a final judgment. The trial court granted judgment in favor of plaintiffs on count IX, as articulated in its January 20, 2009, letter order. In addition, the trial court found that the Swimming Facility Act (Act) (210 ILCS 125/1 et seq. (West 2004)) did not apply to the case. Finally, the trial court granted judgment in favor of defendants on counts I, II, III, IV, V, VI, VII, VIII, and X, finding that plaintiffs failed to meet their burden of proof on these counts. (It is unclear why the trial court ruled on counts I, II, V, VI, VII, VIII, and X, as count VIII had already been voluntarily dismissed by plaintiffs, and the trial court had already granted judgment for defendants on counts I, II, V, VI, VII, and X.)

Defendants filed their notice of appeal on March 17, 2009. Following the trial court's denial of their posttrial motion, plaintiffs filed their notice of cross-appeal on April 13, 2009.

## II. ANALYSIS

On appeal, defendants contend that the trial court erred in four respects: (1) failing to find that all of plaintiffs' claims were barred by the statute of limitations set forth in section 13--118 of the Code; (2) granting plaintiffs' motion to amend count IX based on Alderson and determining that plaintiffs were entitled to judgment under Alderson; (3) failing to find that Nottolini was res judicata as to the issue of whether defendants held complete fee ownership of lot 55; and (4) determining that the Act did not apply to the present case. In their cross-appeal, plaintiffs argue that the trial court erred in granting judgment in favor of defendants on counts I, II, III, IV, V, VI, VII, and X.

### A. Defendants' Appeal

We turn first to defendants' contention with respect to count IX of plaintiffs' complaint, as we determine that its resolution eliminates, or at least limits the extent to which we must resolve, the other issues raised in defendants' and plaintiffs' appeals. We then address the other contentions to the extent necessary.

### 1. Count IX

Defendants contend that the trial court erred in allowing plaintiffs to amend their complaint to include count IX based on Alderson. Under section 2--616(c) of the Code (735 ILCS 5/2--616(c) (West 2008)), "[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." Defendants argue that plaintiffs should not have been permitted to amend their complaint to add count IX based on Alderson, because the evidence presented at trial did not support such a claim. Although defendants contested in the trial court the merits of plaintiffs' Alderson claim, the record on appeal does not contain any written or oral objection by defendants that plaintiffs' claim was not supported by the evidence presented at trial. Nor did defendants raise any other reason plaintiffs should not be allowed to amend count IX. Consequently, defendants have forfeited any claim that the trial court erred in allowing plaintiffs to amend count IX based on Alderson, because defendants failed to object in the trial court to plaintiffs' request to amend. McLean Trucking Co. v. Industrial Comm'n, 96 Ill. 2d 213, 219 (1983) (failure to object to motion for amendment forfeited any claim of error); Moore v. Roberts, 217 Ill. App. 3d 446, 455 (1991) (same).

Defendants also contend that even if it was not error for the trial court to permit plaintiffs to amend count IX to include a count based on Alderson, the trial court erred in granting plaintiffs judgment on their Alderson claim. A trial court's judgment following a bench trial will not be disturbed unless it is against the manifest weight of the evidence. Brynwood Co. v. Schweisberger, 393 Ill. App. 3d 339, 351 (2009). A decision is against the manifest weight of the evidence where "all reasonable people would find the opposite conclusion is clearly apparent" (City of Chicago v. Old Colony Partners, L.P., 364 Ill. App. 3d 806, 812 (2006)) or where the finding is unreasonable, arbitrary, or not based on the evidence presented (Brynwood, 393 Ill. App. 3d at 351). "Where there are different ways to view the evidence, or alternative inferences to be drawn from it, we accept the view of the trier of fact as long as it is reasonable." People ex rel. Illinois Historic Preservation Agency v. Zych, 186 Ill. 2d 267, 278 (1999).

The trial court found that although the quarry was artificial in origin, plaintiffs had riparian rights in the quarry and were entitled to the recreational use of all of the surface waters of the quarry.

In 1988, the Illinois Supreme Court held in Beacham:

"[W]here there are multiple owners of the bed of a private, nonnavigable lake, such owners and their licensees have the right to the reasonable use and enjoyment of the surface waters of the entire lake provided they do not unduly interfere with the reasonable use of the waters by other owners and their licensees." Beacham, 123 Ill. 2d at 232.

In Nottolini, this court concluded that the term "lake" requires that the body of water be of natural origin and that, thus, a man-made quarry (the same one at issue in the present case) could not be considered a "lake." Nottolini, 335 Ill. App. 3d at 1018. We also held that because riparian rights do not extend to artificial bodies of water, the plaintiffs had no rights in the quarry, which was man-made. Nottolini, 335 Ill. App. 3d at 1019.

Five years after Nottolini, the Illinois Supreme Court decided Alderson. In Alderson, the defendant Fatlan opened a sand quarry in 1966 on leased property located in Will County. In the process of excavating the quarry, Fatlan unknowingly excavated across the boundary of the leased property and onto a piece of vacant land owned by the McElvain family. Alderson, 231 Ill. 2d at 313. After Fatlan discontinued mining operations in 1974, the quarry was allowed to fill with water. Alderson, 231 Ill. 2d at 313-14. Due to the excavation onto the McElvain property, some of the water extended onto the McElvain property. Once the quarry was filled with water, multiple homes were built around the quarry and it was used by the residents for recreational purposes only, such as swimming, boating, and fishing. The record did not contain any evidence that any member of the McElvain family ever used the quarry after it was filled with water. Alderson, 231 Ill. 2d at 314.

In 1998, the plaintiffs, Robert and Wanda Alderson, purchased the McElvain property. Alderson, 231 Ill. 2d at 314-15. Shortly thereafter, the Aldersons posted no-trespassing signs and blocked the pathway that surrounded the quarry where it crossed their property. Following unsuccessful litigation in which Fatlan and the other surrounding property owners claimed adverse possession of the portions of the Aldersons' property that

had been quarried and that contained the pathway, Fatlan and some other homeowners erected a cable fence along the Aldersons' property line where it ran through the quarry. The fence blocked the Aldersons' access to and use of the quarry waters except those that lay above their property. Alderson, 231 Ill. 2d at 315.

The Aldersons then instituted an action seeking, among other things, a declaration that they had the right to the reasonable use and enjoyment of the entirety of the quarry's surface waters. Alderson, 231 Ill. 2d at 316. The trial court granted summary judgment in favor of the Aldersons, finding that the quarry was, for all practical purposes, a lake, and because the Aldersons owned a portion of the lake bed, they were entitled under the rule announced in Beacham to the reasonable use of all of the surface waters. Alderson, 231 Ill. 2d at 316-17. The appellate court reversed. Relying on Nottolini, the appellate court determined that the quarry was not of natural origin and, thus, was not a lake and not subject to Beacham. Alderson, 231 Ill. 2d at 317.

The Illinois Supreme Court affirmed the appellate court, but on substantially different grounds. Our supreme court considered "inadequate" the appellate court's analysis that a water-filled quarry is not, as a matter of law, a lake. Alderson, 231 Ill. 2d at 319. The court noted that by having all of the physical and functional characteristics of a lake, an artificial body of water could, for all practical purposes, be a lake. Alderson, 231 Ill. 2d at 319-20. The court further stated that because the water-filled quarry had been used exclusively as a recreational lake since 1974 and would continue to be used as a lake for the foreseeable future, it was a man-made lake. Alderson, 231 Ill. 2d at 320.

The issue presented, according to the court, was whether the <u>Beacham</u> rule--that those who own a portion of the lake bed are entitled to the reasonable use and enjoyment of the surface waters--could be extended to a man-made lake. <u>Alderson</u>, 231 Ill. 2d at 320. While the court acknowledged that, generally, riparian rights do not extend to artificial bodies of water, it went on to say that this did not mean riparian rights could never arise in regard to owners of land abutting an artificial body of water. <u>Alderson</u>, 231 Ill. 2d at 321. Rather, the court held that "where the usage of the artificial body of water has long been settled, it may be appropriate to treat the artificial body as the legal equivalent of a natural one" under the "artificial-becomes-natural rule." <u>Alderson</u>, 231 Ill. 2d at 322.

While the court declined to define the rule completely (<u>Alderson</u>, 231 Ill. 2d at 323), it did, in discussing cases in which it had previously held that an artificial body of water should be considered legally natural, quote extensively from the case of <u>Saelens v. Pollentier</u>, 7 Ill. 2d 556 (1956), in which the defendants attempted to fill an artificially created ditch that had drained waters from the plaintiffs' land for over 50 years. <u>Alderson</u>, 231 Ill. 2d at 321.

" 'It is immaterial that this ditch in question is an artificial ditch rather than a natural stream. We believe that the correct applicable law is stated in 56 Am. Jur. p. 621, sec. 151, to-wit: "An artificial waterway or stream may, under some circumstances, have the characteristics and incidents of a natural watercourse. In determining the question, three things seem generally to be taken into consideration by the courts: (1) whether the way or stream is temporary or permanent; (2) the circumstances under which it was created; and, (3) the mode in which it has been

used and enjoyed. Where the way is of a permanent character, and is created under circumstances indicating an intention that it shall become permanent, and it has been used consistently with such intention for a considerable period, it is generally regarded as stamped with the character of a natural watercourse, and treated, so far as the rules of law and the rights of the public or of individuals are concerned, as if it were of natural origin."

\* \* \*

*** While technically the ditch would not be a natural watercourse, yet as above stated, it was an artificial waterway which by long use became stamped with the character of a natural watercourse, and treated, so far as rules of law and the rights of the public or any individual are considered, as if it were of natural origin.' " Alderson, 231 Ill. 2d at 321, quoting Saelens, 7 Ill. 2d at 561-63.

The Alderson court also held that, at a minimum, application of the artificial-becomes-natural rule requires that "the party invoking the rule has relied upon use of the artificial body of water without dispute for a lengthy period of time." Alderson, 231 Ill. 2d at 323. In support, the court cited cases involving the uncontested use of a body of water for 40 to 50 years. Alderson, 231 Ill. 2d at 323.

Applying this rule to the Aldersons, the court held that they were unable to demonstrate that they had used the quarry in an uncontested manner for a lengthy period of time. Rather, their use of the quarry had been disputed since shortly after they purchased their property, and because the record contained no evidence that the McElvains had ever

used the quarry, the Aldersons could not add on any time the McElvains may have used it. Alderson, 231 Ill. 2d at 323.

In the present case, the trial court found that, under Alderson, plaintiffs were entitled to the reasonable use and enjoyment of the entire surface waters of the quarry, because the quarry, although artificial in origin, had become legally natural under the artificial-becomes-natural rule. The trial court determined that the quarry should be considered legally natural because it is permanent, was created to serve as a source of water recreation, and had been consistently used for water recreation since the 1920s. The trial court further determined that because the quarry was the legal equivalent of a lake, plaintiffs, as owners of lots that abutted lot 55 and extended into the quarry waters, had riparian rights in the quarry. Defendants advance numerous arguments as to why the trial court erred in making such a finding, none of which we find to have any merit.

Defendants first argue that because plaintiffs failed to prove their claims for prescriptive and implied easements, their claim under Alderson must necessarily fail. Defendants do not, however, cite any authority for the proposition that the success of a claim under Alderson depends on the ability to prove the elements of a claim for a prescriptive or an implied easement. Accordingly, defendants have forfeited this issue. See 210 Ill. 2d R. 341(h)(7) (requiring citation to legal authorities); Vine Street Clinic v. HealthLink, Inc., 222 Ill. 2d 276, 301 (2006) (points raised in brief but unsupported by authority are forfeited); Orzel v. Szewczyk, 391 Ill. App. 3d 283, 287 (2009) (same). Moreover, the Alderson court specifically noted that the riparian rights doctrine that it discussed was distinct from other methods of obtaining rights to artificial bodies of water,

-18-

such as prescriptive or implied easements. See Alderson, 231 Ill. 2d at 324 ("Finally, we note that rights to artificial bodies of water may arise by means other than the riparian rights doctrine, such as grants, easements by prescription, or easements by implication").

Defendants next argue that plaintiffs failed to demonstrate that the quarry was legally natural under the artificial-becomes-natural rule. According to defendants, Nottolini already adjudicated the quarry to be artificial and such a determination is the law of the case. To now determine that the quarry is legally natural, defendants argue, would be to reverse Nottolini. This contention fails for two reasons. First, while Nottolini recognized that the quarry is artificial in origin (a fact that remains undisputed in the present case) and thus determined that Beacham did not apply, it never addressed the question of whether the quarry, although artificial in origin, should be considered legally natural under the artificial-becomes-natural rule. Thus, a determination that the quarry is legally natural under the artificial-becomes-natural rule would not reverse Nottolini's determination that the quarry is artificial in origin; rather, it would simply be the resolution of a separate issue not presented in Nottolini. Moreover, defendants' contention that Nottolini's determination is the law of the case fails because the law-of-the-case doctrine "bars relitigation of an issue previously decided in the same case." (Emphasis added.) Krautsack v. Anderson, 223 Ill. 2d 541, 552 (2006); see also People ex rel. Madigan v. Illinois Commerce Comm'n, 394 Ill. App. 3d 382, 391 (2009) ("Unlike collateral estoppel, *** the law-of-the-case doctrine applies to issues already determined in the same case" (emphasis in original)). Needless to say, although Nottolini and the present case involved the same quarry, they are not the same

case and, thus, the law-of-the-case doctrine does not apply. See Madigan, 394 Ill. App. 3d at 391 (law-of-the-case doctrine did not apply where the cases were not the same).

Defendants also argue that plaintiffs failed to demonstrate that the quarry was legally natural under the artificial-becomes-natural rule, because they failed to demonstrate 40 to 50 years of uninterrupted and uncontested use of the quarry for recreational purposes. In its letter order of January 20, 2009, the trial court made the following specific findings regarding the historical use of the quarry:

"The evidence establishes the circumstances under which Lot 55 was created were that its owners wished to develop Fox River Beach Subdivision as a resort/vacation subdivision 'with fishing, bathing, boating[,] skating, and other summer and winter sports right at your door.' [Citation.] For many decades its use has been in accordance with the intentions and commitments of the original owner/developers, Froetschers and Casurellas. Plaintiffs and their predecessors-in-interests have invested in improvements to their properties to enhance their use of the quarry waters in reliance on this long term use.

Over forty years of uninterrupted use of the quarry waters for recreation in the manner originally intended by the Fox River Beach owner/developers has been testified to by six witnesses in this case, and a seventh, Ethel Thom, daughter of the original developers, testified to over seventy years of such use. [Citation.] Not one witness has testified that the quarry, or Lot 55, has ever, since the 1920's, not been used for recreation such as swimming, fishing, boating, skating and the like by the shoreline owners, up until the events of 2005, which are the basis of this case. Such

use had been continuous until this 2005 interruption, by all accounts. The fact of long

term use of the quarry for recreational purposes has never been a contested issue in

this case."

The trial court also specifically stated that "[t]he Court credits the testimony of the plaintiffs

and their witnesses as to the historical uses of Lot 55 from 1925 until 2005, when this case

was filed."

According to defendants, the proof presented at trial was that "since 1969, the

Defendants have contested any one's [sic] use of Lot 55" and that plaintiffs admitted as

much in their complaint. Paragraph 74 of plaintiffs' complaint reads: "From time to time

since 1969 [Frank] Dwyer or his son, Dr. William Dwyer, suggested that [the] Dwyers had

a right to restrict swimming or other use of Lot 55 by other subdivision owners, but use of

the quarry continued uninterrupted by plaintiffs and their predecessors in title." An

allegation that defendants "suggested" that they had a right to restrict swimming or other

uses of the quarry hardly equals an admission that since 1969 defendants actually contested

the use of the quarry by anybody, especially in light of the fact that paragraph 74 goes on

to state that plaintiffs' use of the quarry continued uninterrupted. Moreover, paragraph 74

makes no admission that defendants, in fact, held the right to restrict the use of the quarry.

Defendants also contend that they contested plaintiffs' use of the quarry by excluding

people from the quarry, asking people to remove items from the quarry, and conditioning

the use of the quarry on compliance with rules and regulations established by defendants.

Dwyer testified that in 2003 he denied Julie Morgan permission to use the quarry and that

after observing guests of Belluomini swimming across the quarry in violation of the rules,

he told Belluomini that he would not be permitted to use the quarry if his guests did not comply with the rules. Dwyer also testified that he distributed to shoreline owners rules and regulations regarding the use of the quarry. Richard Reuter testified that at one point one of his trees had fallen into the quarry and that Frank Dwyer asked him to remove it.

This evidence does not demonstrate that the trial court's determination that the quarry was used in a continuous and uncontested manner by plaintiffs and their predecessors-in-interest for over 40 years was against the manifest weight of the evidence, given the other evidence that was presented on the matter. Morgan testified that despite Dwyer's statement that she could not use the quarry, she continued to do so until the events that gave rise to the present case. The record contains several documents that defendants contend are copies of the rules and regulations Dwyer distributed to plaintiffs and upon which use of the quarry was conditioned. None of these documents, however, makes any mention that use of the quarry was conditioned on compliance, and nearly all of the "rules" and "regulations" are phrased in suggestive, rather than mandatory, language. In addition, each document refers to reaching a "consensus" among the property owners, asks for the input and participation of the other property owners, and was co-authored by Ralph Tredup, a shoreline property owner with no ownership interest in lot 55. Reuter testified when Frank requested that he remove the tree, he responded that he would do so only once the weather turned colder, because the tree served as a good habitat for the fish in the quarry. Most importantly, however, plaintiffs and their witnesses testified to the continuous recreational use of the quarry by the shoreline owners for at least 40 years and that no one had ever suggested, until the events giving rise to the present case, that their use

of the quarry was improper or not permitted (with the exception of Julie Morgan). The trial court specifically credited this testimony and we will not disturb that determination. See Fontana v. TLD Builders, Inc., 362 Ill. App. 3d 491, 506 (2005) ("as finder of fact, it was the trial court's role in a bench trial to assess the credibility of witnesses"); In re Marriage of Pfeiffer, 237 Ill. App. 3d 510, 513 (1992) ("It is not the function of this court to reweigh the evidence or assess the credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence").

Defendants make no other arguments as to why the trial court erred in finding that the quarry should be considered legally natural under Alderson. Accordingly, we determine that the trial court's conclusion was not against the manifest weight of the evidence.

Defendants also argue that plaintiffs failed to prove that they owned any portion of lot 55 or the quarry bed, because Nottolini had adjudicated defendants the sole owners of the quarry bed and because the testimony of professional surveyor Ernst Kohn that defendants were the sole owners of lot 55 went unrebutted. Neither of these contentions demonstrates that the trial court's specific findings that plaintiffs owned portions of the quarry bed were against the manifest weight of the evidence.

Defendants' contention that Nottolini adjudicated defendants the sole owners of the quarry bed is without merit because no such determination was made in that case. Although the court in Nottolini used the terms "lot 55" and "quarry" interchangeably, the issue of whether lot 55 was coextensive with the quarry, and thus whether anyone other than defendants had a property interest in the quarry bed, was never reached. Rather, the

court in Nottolini resolved the matter by determining that, because a man-made quarry could not be considered a lake, the Nottolinis were not entitled to any riparian rights in the surface waters of the quarry. Nottolini, 335 Ill. App. 3d at 1019. Thus, the court's statement that "defendants retain[ed] complete ownership rights in the quarry" was not a determination that defendants owned the entirety of the quarry bed, but only that the Nottolinis had no rights to the use of the quarry's surface waters.

Similarly without merit is defendants' contention that plaintiffs failed to prove any ownership interest in lot 55 or the quarry bed because Kohn's testimony that defendants were the sole owners of lot 55 went unrebutted. Kohn testified that in 2005, he conducted a boundary survey for Dwyer. He gave no testimony about the ownership of lot 55. A copy of the survey Kohn performed was entered into evidence at trial. That survey does not specify who owns lot 55 or the names of any of the owners of the lots surrounding lot 55. Accordingly, Kohn's testimony that defendants were the sole owners of lot 55 went unrebutted because Kohn never testified that defendants were the sole owners of lot 55.

Moreover, we note that whether defendants are the sole owners of lot 55 is irrelevant to the issue of whether plaintiffs own any portion of the quarry bed. Although defendants consistently, throughout trial and on appeal, have treated lot 55 as if it were coextensive with the quarry, nothing in the record establishes such a fact. Rather, Kohn's survey, along with surveys of other lots surrounding the quarry, indicate that the quarry's banks and waterline extend outside the boundaries of lot 55 and onto other surrounding lots.

The trial court specifically found that "[t]he plaintiffs' waterfront lots extend into the quarry water to some extent before reaching the lot line of Lot 55" and that "[l]and surveys

and testimony in evidence show that plaintiffs' lots abut Lot 55 *** and extend into the quarry waters, some up to fourteen feet and more into those waters." In support of these findings, the trial court cited numerous land surveys that were admitted into evidence and testimony offered by several witnesses. Defendants make no argument that these findings were against the manifest weight of the evidence or that the evidence relied upon by the trial court was somehow deficient. Accordingly, we hold that the trial court's determination that plaintiffs owned a portion of the quarry bed was not against the manifest weight of the evidence.

Defendants next contend that, in determining that plaintiffs had the right to the reasonable use and enjoyment of the quarry's surface waters, the trial court failed to consider that "for the last 40 years, the Defendants have paid the taxes, maintained the property and managed Lot 55 while experiencing a person drown in this dangerous tract of land." Defendants do not explain how the payment of taxes or the maintenance and management of lot 55 affect whether plaintiffs are entitled to use the quarry's surface waters. Nor do defendants cite any authority for the proposition that the trial court was required to consider such issues in determining whether plaintiffs had riparian rights in the quarry. Accordingly, this contention is forfeited. See Roiser v. Cascade Mountain, Inc., 367 Ill. App. 3d 559, 568 (2006) (contention is forfeited where the party fails to present any reasoned argument or supporting legal authority).

Finally, defendants contend that (1) the artificial-becomes-natural rule does not apply to quarries or man-made lakes and instead applies only to streams or other watercourses; and (2) plaintiffs never presented a claim for riparian rights to the trial court, as evidenced

by the trial court's failure to address defendants' right to withdraw permission for recreational activities on lot 55 and what constituted reasonable use of lot 55. Both of these contentions are forfeited because they are raised by defendants for the first time in their reply brief. See 210 Ill. 2d R. 341(h)(7) (points not argued in the appellant's brief are forfeited); 210 Ill. 2d R. 341(j) (reply brief "confined strictly" to responding to the arguments presented in the appellee's brief); Sylvester v. Chicago Park District, 179 Ill. 2d 500, 507 (1997) (issues raised for the first time in the reply brief are forfeited). Moreover, with respect to the claim that the artificial-becomes-natural rule does not apply to quarries, defendants overlook the glaring fact that the Illinois Supreme Court applied the rule to the man-made quarry at issue in Alderson but simply found that the rule was not satisfied because the Aldersons had not demonstrated their uncontested use of the quarry for a sufficient length of time. See Alderson, 231 Ill. 2d at 323. As to the second contention, plaintiffs clearly presented a claim for riparian rights to the trial court when they requested, and were granted, leave to amend count IX to state a claim based on Alderson--a case involving the sole issue of riparian rights.

### 2. Statute of Limitations

Defendants next argue that the trial court erred in not dismissing plaintiffs' complaint in its entirety based on the statute of limitations set forth in section 13--118 of the Code. We address this contention only as it relates to count IX because, as we discuss below, our affirmance of the trial court's decision on count IX eliminates the need to address the trial court's judgment in favor of defendants on counts I, II, III, IV, V, VI, VII, and X.

Section 13--118 of the Code provides:

"No action based upon any claim arising or existing more than 40 years before the commencement of such action shall be maintained in any court to recover any real estate in this State or to recover or establish any interest therein or claim thereto, against the holder of the record title to such real estate when such holder of the record title and his or her grantors immediate or remote are shown by the record to have held chain of title to such real estate for at least 40 years before the action is commenced, unless such claimant, by himself or herself, or by his or her attorney or agent, or if he or she is a minor or under legal disability, by his or her guardian, trustee, either parent, or any other person acting in his or her behalf shall within 40 years after the claim upon which such action is based arises, file in the office of the recorder of the county wherein such real estate is situated, a verified statement definitely describing the real estate involved, the nature and extent of the right or interest claimed, and stating the facts upon which the same is based. However, the holder of the record title to such real estate shall not be entitled to the protection of Sections 13--118 through 13--121 of this Act if the real estate is in the adverse possession of another." 735 ILCS 5/13--118 (West 2006).

Defendants argue that plaintiffs' claims were not brought within 40 years and, thus, were barred by section 13--118.

We determine that defendants have forfeited any claim that count IX was barred by section 13--118 of the Code, for failure to raise it in the trial court. Although defendants raised section 13--118 as an affirmative defense to other claims of plaintiffs, nothing in the record indicates that defendants ever argued in the trial court that count IX was barred by

section 13--118 of the Code. Accordingly, any contention that the trial court erred in failing to dismiss count IX on this basis is forfeited. Smith v. Menold Construction, Inc., 348 Ill. App. 3d 1051, 1058 (2004) ("a statute of limitations is an affirmative defense which a defendant forfeits if not raised"); Ward v. Community Unit School District No. 220, 243 Ill. App. 3d 968, 975 (1993) ("Defendants waived the issue of the application of the Tort Immunity Act for this appeal by failing to raise it in the trial court").

### 3. Nottolini and Res Judicata

According to defendants, the trial court erred when it failed to find that defendants held complete fee ownership in lot 55 as previously determined in Nottolini. According to defendants, Nottolini is res judicata on the issue of defendants' complete fee ownership of lot 55. Defendants' contention fails for several reasons.

First, the ownership of lot 55 was never at issue in the present case. None of the plaintiffs claimed an ownership interest in lot 55, and all acknowledged that title to lot 55 was held by defendants. Rather, plaintiffs simply sought, under various legal theories, a declaration of their rights to use the quarry for recreational purposes. As a result, even in determining that plaintiffs had a right to use the entire surface waters, the trial court, in its final judgment, made no determination that altered defendants' ownership rights in lot 55. In fact, the trial court acknowledged in its final judgment that defendants are the owners of lot 55.

Although the trial court did make the factual findings that plaintiffs' "waterfront lots extend into the quarry water to some extent before reaching the lot line of Lot 55" and that "[l]and surveys and testimony in evidence show that plaintiffs' lots abut Lot 55 *** and

-28-

extend into the quarry waters, some up to fourteen feet and more into those waters," such findings are not the equivalent of findings that plaintiffs have some ownership interest in lot 55; instead, they merely reflect that the trial court found that the quarry was not completely contained within the boundaries of lot 55, but that it also extended onto the surrounding lots belonging to plaintiffs. Nor is plaintiffs' contention that they own a portion of the quarry bed necessarily a contention that they own a portion of lot 55. More important, however, is that a determination that plaintiffs own a portion of the quarry bed is not inconsistent with the decision in Nottolini. The issue of whether the boundaries of lot 55 completely encompass the quarry or whether the quarry extends beyond the boundaries of lot 55 was neither raised nor litigated in Nottolini; the outcome in Nottolini was based entirely on the determination that the quarry was a man-made body of water to which riparian rights did not extend.

Moreover, we determined, in the earlier appeal in this case, that Nottolini does not bar plaintiffs' claims under the doctrine of res judicata, because there was no identity of causes of action and no identity of parties. Bohne I, No. 2--05--0861. We concluded that there was no identity of causes of action in part because the cause of action in Nottolini--a claim for riparian rights under Beacham--was distinct from the causes of action that plaintiffs were alleging at that time--easements, estoppel, and contract. Defendants contend that because plaintiffs now seek riparian rights under Alderson, there is an identity of causes of action and that, thus, Nottolini does serve as res judicata. Whether defendants' contention has any merit and whether we could even revisit the issue at this juncture are irrelevant, as we also determined that there was no identity of parties. Defendants make

no argument as to how our determination in Bohne I that there was no identity of parties was erroneous, and without a determination that there is an identity of parties in the present case and in Nottolini, the doctrine of res judicata cannot apply. See Hudson v. City of Chicago, 228 Ill. 2d 462, 467 (2008) ("Three requirements must be satisfied for res judicata to apply: (1) a final judgment on the merits has been rendered by a court of competent jurisdiction; (2) an identity of cause of action exists; and (3) the parties or their privies are identical in both actions").

### 4. Swimming Facility Act

Finally, defendants argue that the trial court erred in determining that the Act did not apply to this case. At trial, defendants put on evidence in an attempt to show that they would be subject to the provisions of the Act if plaintiffs were afforded rights to use the quarry. According to defendants, they would be subject to an "undue burden" if they were subjected to the Act, because, under it, they would have to, among other things, obtain licensing and comply with the rules and regulations of the Department of Public Health. The trial court determined that the Act did not apply to the present case, even if plaintiffs were granted rights to use the quarry, because the Act regulates only public beaches and not those private beaches utilized by the shoreline owners on the quarry.

Defendants spend considerable time arguing why the Act does, in fact, apply to the present case, but they do not explain what effect the applicability of the Act has in this case except to say that subjecting defendants to the Act places an "undue burden" on them and "grant[s] Plaintiffs all of the benefits of Lot 55 without imposing any responsibility on them

whatsoever." Ironically, while claiming that the application of the Act would subject them to an undue burden, defendants seek a declaration that the Act applies.

In addition to failing to explain how the applicability of the Act has any bearing on the ultimate relief granted in this case, defendants fail to cite any authority for the proposition that "undue burden[s]" and the allocation of responsibilities should be taken into consideration in determining whether plaintiffs are entitled to riparian rights under Alderson. Consequently, this contention is forfeited. See 210 Ill. 2d R. 341(h)(7); Vine Street Clinic, 222 Ill. 2d at 301; Orzel, 391 Ill. App. 3d at 287.

### B. Plaintiffs' Cross-Appeal

In their cross-appeal, plaintiffs argue that the trial court erred in granting judgment in favor of defendants on counts I, II, III, IV, V, VI, VII, and X. Each of these counts ultimately sought a declaration of plaintiffs' rights to use the entirety of the quarry's surface waters for reasonable recreational use without unreasonable interference by defendants. As the trial court granted such relief under count IX and we have affirmed that judgment, we need not address whether plaintiffs are entitled to the identical relief under other legal theories.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Kane County circuit court.

Affirmed.

McLAREN and HUTCHINSON, JJ., concur.