Docket No. 104772.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

ROBERT L. ALDERSON *et al.*, Appellants, v. LEO E. FATLAN *et al.*, Appellees.

*Opinion filed September 18, 2008.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

## OPINION

The plaintiffs, Robert and Wanda Alderson, filed an action in the circuit court of Will County in which they sought a declaration that they have surface rights to a water-filled quarry that is used for recreational purposes. Plaintiffs contended they are entitled to the reasonable use and enjoyment of the entire surface waters because they own a portion of the quarry bed. The circuit court granted summary judgment for plaintiffs, reasoning that the case was controlled by *Beacham v. Lake Zurich Property Owners Ass'n*, 123 Ill. 2d 227 (1988), wherein this court held that the owner of a portion of a natural lake bed obtains rights to the surface waters of the entire lake, subject to the reasonable use of other owners of the lake bed.

The appellate court, with one justice dissenting, reversed the judgment of the circuit court. 372 Ill. App. 3d 300. The appellate court concluded that the rule announced in *Beacham* had no application to plaintiffs' case because the body of water at issue is man-made and, therefore, not a "lake" within the meaning of the law.

For the reasons that follow, we affirm the judgment of the appellate court, although on somewhat different grounds.

Background

The following facts are taken from the parties' pleadings and supporting exhibits. In 1966, Leo Fatlan opened a sand quarry on leased property in unincorporated Will County just south of Braidwood, Illinois. At the time of its completion some years later, the quarry covered approximately 20 acres and was roughly rectangular in shape, with its longer sides running north and south. Abutting the quarry on the north half of its east side was approximately 11 acres of vacant property owned by the McElvain family. Sometime after the quarry was begun, Fatlan unknowingly excavated across the property line and onto the McElvain property.

In 1968, Fatlan purchased the original quarry property. In 1970, after running a title commitment, Fatlan learned of the incursion onto the McElvain property. Fatlan then had a conversation with James McElvain[1] in which he told him he had quarried across the property line and that he "needed that property." The record does not reveal what McElvain said during this conversation. However, it is undisputed that McElvain took no action and made no demands against Fatlan.

---

[1] It is unclear from the record whether James McElvain owned the 11-acre property in 1970. In a previous appellate decision regarding a separate issue related to the quarry, which is part of the record on appeal, the appellate court referred to James McElvain as the owner. However, the court also cited testimony from James' brother in which he stated that his father and uncle had purchased the property in the 1940s and that James "managed" the property from 1966 to 1993. See *Fatlan v. Alderson*, No. 3–00–0890 (2001) (unpublished order under Supreme Court Rule 23).

In 1974, Fatlan discontinued mining operations and allowed the quarry to fill with water. Because of the previous excavation across the McElvain property line, the water which filled the quarry covered a portion of the McElvain property. Although measurements from 1974 are not available, it appears from plats in the record that, at present, the portion of land across the property line that is covered with water runs approximately 300 to 400 feet from north to south and extends some 10 to 20 feet eastward. The depth of the water on the property is approximately five feet.

The record does not reveal whether Fatlan obtained permission to flood the McElvain property. There is no flowage easement or other written instrument in the record and no indication that Fatlan spoke to anyone from the McElvain family when the quarry filled with water. Since 1974, the water-filled quarry has been used exclusively as a recreational lake, employed for purposes such as swimming, boating and fishing. The record is silent, however, as to whether anyone from the McElvain family used it for these purposes.

In 1981, Fatlan sold four residential lots at the south end of the man-made lake to family friends. Homes were built on the lots and, on an adjacent lot, Fatlan built a fifth home for himself. After the homes were built, the homeowners placed broken concrete around the edge of the lake to prevent erosion, constructed a duck blind, and placed no-trespassing signs on a pathway that went around the lake. Some years later, in order to conform to the Will County zoning ordinance, the homes and the lake were rezoned as a planned unit development. According to the terms of the planned unit agreement, the man-made lake is to remain open as a conservation easement. The lake is presently owned in trust with rights shared by Fatlan and the four other current homeowners.

In 1998, the 11-acre property owned by the McElvain family was sold to the plaintiffs, Robert and Wanda Alderson. The record does not reveal whether anyone spoke with the Aldersons about the lake or whether any representations were made to the Aldersons regarding a right of access to the surface waters.

Within a week of their purchase of the McElvain property, the Aldersons placed no-trespassing signs and concrete barriers on the section of the pathway around the lake that crossed their property. Thereafter, Fatlan and the other homeowners sent two letters to the

Aldersons requesting that they sell them the entire 11 acres of property they had purchased from the McElvain family. The Aldersons declined to sell the property and proceeded to construct a home.

Shortly thereafter, Fatlan and the other homeowners filed an action seeking to eject the Aldersons and to quiet title. Fatlan and the homeowners alleged that they were entitled, through adverse possession, to the portion of the Aldersons' property that had been quarried, as well as the portion of the property that contained the pathway around the lake. Following a trial, the circuit court entered judgment in favor of the Aldersons. Although the circuit court did not determine whether Fatlan had been given permission to flood the property in 1974, the court did find, among other things, that Fatlan had been given permission to quarry across the property line by James McElvain in 1970. In large part because the excavation of the property was not adverse, the circuit court rejected the adverse possession claim. The appellate court affirmed. *Fatlan v. Alderson*, No. 3–00–0890 (2001) (unpublished order under Supreme Court Rule 23).

In 2003, Fatlan and the four other homeowners installed a cable fence alongside the length of the Aldersons' property line where it ran through the lake. The fence blocked the Aldersons' access to all but that portion of the waters which lay above their own property.

In October of 2003, the Aldersons filed this action against Fatlan, the four other homeowners and the lake trust (the defendants). The Aldersons' complaint contained four counts. Count I sought a declaration that the Aldersons have a right to the reasonable use and enjoyment of the surface waters of the entire man-made lake. Count II sought an injunction to prevent defendants from taking any action that would deprive the Aldersons of access to the surface waters of the entire lake. Count III alleged that the cable fence was a public nuisance, and count IV alleged that the installation of the fence amounted to an intentional infliction of emotional distress.

Defendants filed an answer and a two-count counterclaim. Defendants then moved for summary judgment on counts I, II and IV

of plaintiffs' complaint.[2] The Aldersons, in response, moved for summary judgment on the declaratory judgment count (count I) of their complaint. In their motion, the Aldersons noted the rule set forth in *Beacham v. Lake Zurich Property Owners Ass'n*, 123 Ill. 2d 227 (1988), that all owners of a private, nonnavigable lake bed have the right to the reasonable use and enjoyment of the surface waters of the entire lake. The Aldersons contended that they owned a portion of the lake bed at issue and, consequently, that *Beacham* was dispositive of their case.

Following a hearing, the circuit court granted judgment in favor of the Aldersons. In so ruling, the court found that, because the quarry at issue in this case had been allowed to fill with water and had been dedicated for recreational purposes, it was, for all practical purposes, a lake. The circuit court further found that, based on the prior rulings of the court in the adverse possession case, the Aldersons owned a portion of the lake bed. Based on these findings, the circuit court concluded that the rule set forth in *Beacham* applied and the Aldersons were entitled to the use of the surface waters of the entire lake. Accordingly, the circuit court granted the Aldersons' motion for summary judgment, denied defendants' motion, and expressly forbade defendants from constructing a fence or other barrier in the lake.

The appellate court reversed the judgment of the circuit court and remanded for entry of summary judgment in favor of defendants. 372 Ill. App. 3d 300. The appellate court stated that the case before it turned solely on "whether the body of water at issue is a 'lake,' " and explained that if the water-filled quarry is a lake, it is "quite clear" that the Aldersons have rights to the entire surface. 372 Ill. App. 3d at 301. Citing to *Nottolini v. La Salle National Bank*, 335 Ill. App. 3d 1015 (2003), the court then defined a lake as " ' "a reasonably permanent body of water substantially at rest in a depression in the surface of the earth, if both depression and body of water are of

---

[2]Defendants filed a separate motion to dismiss count III of the Aldersons' complaint in which they alleged that the Aldersons lacked standing to pursue an action for public nuisance. That motion is not at issue here. Defendants additionally moved for summary judgment on their counterclaim. That motion also is not at issue.

natural origin or a part of a watercourse.” ’ ” 372 Ill. App. 3d at 302, quoting *Nottolini*, 335 Ill. App. 3d at 1018, quoting 78 Am. Jur. 2d *Waters* §108 (2002). Relying on this definition, the appellate court held that the water-filled quarry at issue here is not of natural origin and, hence, is not a “lake.” Consequently, the appellate court concluded that *Beacham* did not apply.

Justice McDade dissented. In her dissent, Justice McDade stated that the majority opinion drew “unnecessary and unwarranted distinctions” between man-made and natural lakes and, in addition, that it “violate[d] the spirit and purpose of the supreme court’s holding in *Beacham*.” 372 Ill. App. 3d at 302-06 (McDade, J., dissenting).

We granted the Aldersons’ petition for leave to appeal. 210 Ill. 2d R. 315.

Analysis

This appeal is before us on the appellate court’s reversal of the circuit court’s entry of summary judgment in favor of the Aldersons. Summary judgment is appropriate where “the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” 735 ILCS 5/2–1005(c) (West 2000). Our review of a grant of summary judgment is *de novo*. *Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 146 (2003).

The Aldersons’ primary contention on appeal is that the appellate court decision erroneously deprives them of their riparian rights, as defined in *Beacham*, to the use of the surface waters of the entire lake. The term “riparian rights” refers, in general, to the rights of an owner of land that borders on a body of water or watercourse to the use of the water. Black’s Law Dictionary 1352 (8th ed. 2004).[3]

_____

[3]Historically, the term “littoral rights” was used to refer to the water rights which exist in property that abuts a lake. However, as in most jurisdictions, contemporary Illinois cases use the term “riparian rights” to refer both to rights which exist in land abutting rivers and land abutting lakes. See, *e.g.*, *Knaus v. Dennler*, 170 Ill. App. 3d 746, 750 (1988); R.

Riparian rights originate, not by grant, but by operation of law, solely because the land abuts the body of water. *Bouris v. Largent*, 94 Ill. App. 2d 251, 256 (1968) (to be riparian property "it is only necessary that the description of the property include or encompass the shore line").

At common law, "riparian rights of property owners abutting the same body of water are equal, and no such property owner may exercise its riparian rights in such a manner so as to prevent the exercise of the same rights by other similarly situated property owners." *Knaus v. Dennler*, 170 Ill. App. 3d 746, 750 (1988). In *Beacham* this court addressed the application of this principle where the riparian owners' property not only abuts the shore of the lake, but also includes separate portions of the lake bed. We noted that other jurisdictions had developed two different approaches to resolving the rights of the riparians owners in this situation: a so-called common law rule, and a so-called civil rule. Under the common law rule, the owner of a part of a lake bed has the right to the exclusive use and control of the waters above that property. Under the civil rule, in contrast, the ownership of a portion of a lake bed entitles the owner to the reasonable use of the entire lake surface. After discussing the cases from other jurisdictions, we concluded that "[r]estricting the use of a lake to the water overlying the owner's lake bed property can only frustrate the cooperative and mutually beneficial use of that important resource" and, therefore, that the civil law rule was the better approach. *Beacham*, 123 Ill. 2d at 232. Accordingly, we held that "where there are multiple owners of the bed of a private, nonnavigable lake, such owners and their licensees have the right to the reasonable use and enjoyment of the surface waters of the entire lake provided they do not unduly interfere with the reasonable use of the waters by other owners and their licensees." *Beacham*, 123 Ill. 2d at 232

As noted, the appellate court below declined to apply *Beacham* to this case based on its determination that, as a matter of law, a water-filled quarry is not a lake. In our view, this analysis is inadequate. As both the circuit court and the dissenting appellate justice below

---

Beck, Illinois Natural Resources Law: Coal, Oil and Gas, and Water 329 n.48 (1985).

recognized, an artificial body of water may have all the physical and functional characteristics of a lake and hence, for all practical purposes, be a lake. Indeed, the Restatement (Second) of Torts, from which the *Nottolini* court's definition of a lake is ultimately derived (see *Nottolini*, 335 Ill. App. 3d at 1018, citing 78 Am. Jur. 2d *Waters* §108 (2002), citing Restatement (Second) of Torts §842 (1979)) expressly recognizes that its definition "does not include artificially created lakes." Restatement (Second) of Torts §842, Comment *a*, at 192 (1979). In this case, the water-filled quarry has been used exclusively as a recreational lake since 1974 and, under the planned unit agreement, will continue to be used as a lake for the foreseeable future. Clearly, it is a man-made lake.

However, determining that the water-filled quarry is a man-made lake does not end this case. The lake at issue in *Beacham* was a natural, not artificial, one. Accordingly, we believe the issues to be resolved in this case are best stated as whether riparian rights in general, and whether the rule in *Beacham* in particular, may be extended to a man-made lake.

Both *Nottolini* and the appellate court below briefly noted the general principle that riparian rights do not extend to artificial bodies of water.[4] 372 Ill. App. 3d at 302, quoting *Nottolini*, 335 Ill. App. 3d at 1019; see generally *Anderson v. Bell*, 433 So. 2d 1202, 1204-05 (Fla. 1983) (collecting cases); 1 Waters & Water Rights §6.02(e), at 6–173, 6–174 (2007) ("It is axiomatic that riparian rights do not attach to artificial waterbodies"); 78 Am. Jur. 2d *Waters* §37 (2002). The commonsense rationale underlying this principle is that, unlike a natural body of water, which exists because of natural processes, an artificial body of water is the result of someone's labor. An artificial body of water is not a natural resource to be shared by all. Consequently, as a general rule, it would be inequitable to grant a property owner rights to an artificial body of water that has been created by someone else solely because the property abuts the water.

---

[4]This rule explains the Restatement's definition of the word "lake." The Restatement limits the definition of a lake to natural bodies of water, not because a man-made body of water can never be considered a lake, but because, as a general rule, riparian rights exist only in property abutting naturally occurring bodies of water.

This is not to say, however, that riparian rights may never arise in land abutting an artificial body of water. For example, in *Saelens v. Pollentier*, 7 Ill. 2d 556 (1956), we considered whether the plaintiff landowner had a right to have an artificial ditch that ran through his land and had been in existence for more than 50 years remain open to allow the escape of water. We stated:

> "It is immaterial that this ditch in question is an artificial ditch rather than a natural stream. We believe that the correct applicable law is stated in 56 Am. Jur. p. 621, sec. 151, to-wit: 'An artificial waterway or stream may, under some circumstances, have the characteristics and incidents of a natural watercourse. In determining the question, three things seem generally to be taken into consideration by the courts: (1) whether the way or stream is temporary or permanent; (2) the circumstances under which it was created; and, (3) the mode in which it has been used and enjoyed. Where the way is of a permanent character, and is created under circumstances indicating an intention that it shall become permanent, and it has been used consistently with such intention for a considerable period, it is generally regarded as stamped with the character of a natural watercourse, and treated, so far as the rules of law and the rights of the public or of individuals are concerned, as if it were of natural origin.'
>
> * * *
>
> *** While technically the ditch would not be a natural watercourse, yet as above stated, it was an artificial waterway which by long use became stamped with the character of a natural watercourse, and treated, so far as rules of law and the rights of the public or any individual are considered, as if it were of natural origin." *Saelens*, 7 Ill. 2d at 561-63.

See also, *e.g.*, *Gough v. Goble*, 2 Ill. 2d 577 (1954) (right to have an artificial culvert that had been in use for 40 years remain open); *Baumgartner v. Bradt*, 207 Ill. 345 (1904); *Beidler v. Sanitary District*, 211 Ill. 628 (1904); *DuPont v. Miller*, 310 Ill. 140 (1923); *Dessen v. Jones*, 194 Ill. App. 3d 869, 878-80 (1990); *United States v. 1,629.6 Acres of Land*, 503 F.2d 764, 768 n.9 (3d Cir. 1974) (collecting cases); R. Beck, Illinois Natural Resources Law: Coal, Oil and Gas, and Water, 330 (1985), ("[I]t is apparent that man-made

bodies of water can come to be treated as natural bodies of water and that private riparian rights can be acquired on man-made bodies of water as well"); 1 Waters & Water Rights §6.02(e) (2007); 78 Am. Jur. 2d *Waters* §252 (2002).

The "artificial-becomes-natural" rule recognized in the foregoing authorities stems, in part, from the difficulties that can arise in trying to distinguish the man-made from the natural, particularly with the passage of significant amounts of time. See A. Evans, *Riparian Rights in Artificial Lakes and Streams*, 16 Mo. L. Rev. 93, 107 (1951); see also *Druce v. Blanchard*, 338 Ill. 211, 213 (1930) ("the hand of man had been operating in years previous to the bringing of suit to affect the workings of the above [lake] system as it functioned in a state of nature, such operations going so far back and being of such sort as to make it difficult to conclude just how it did work in a natural state"). More fundamentally, however, the artificial-becomes-natural rule is justified by principles of fairness and equity. Simply put, in some cases, where the usage of the artificial body of water has long been settled, it may be appropriate to treat the artificial body as the legal equivalent of a natural one. See generally 16 Mo. L. Rev. 93.

The artificial-becomes-natural rule has been called "somewhat vague" (*1,629.6 Acres of Land*, 503 F.2d at 768), and "difficult to apply" (J. Corbridge, *Surface Rights in Artificial Watercourses*, 24 Nat. Resources J. 887, 912 (1984)). We do not attempt to define the rule with any completeness here. We note, however, that as a minimum requirement, cases applying the rule have done so only in situations where the party invoking the rule has relied upon use of the artificial body of water without dispute for a lengthy period of time. See, *e.g.*, *Saelens*, 7 Ill. 2d 556 (more than 50 years of uncontested use); *Gough*, 2 Ill. 2d 577 (40 years of uncontested use). The Aldersons cannot meet this requirement. The Aldersons use of the lake has been a matter of dispute since shortly after they purchased the McElvain property in 1998. Nor can the Aldersons add the period of time the McElvains used the lake to their own as there is nothing in the record to indicate that anyone from the McElvain family ever made use of the lake. We think it clear then, that on this record, the Aldersons' usage of the lake has not reached the type of settled condition such that the artificial-becomes-natural rule may be applied.

The Aldersons contend, however, that ownership of the lake bed is all they need establish to be entitled to the use of the surface waters of the entire lake. We disagree. The adoption of such a rule with respect to man-made lakes would be unwise. Consider, for example, the case of a property developer who sells residential lots to a small number of people with the understanding that he will build a man-made lake to which they will have exclusive access. The developer's engineers then miscalculate when constructing the lake and a portion of property that was not intended to be flooded is overflowed. It might be the case that the developer should be required to compensate the owner of the flooded property. See, *e.g.*, *Bradbury v. Vandalia Levee & Drainage District*, 236 Ill. 36, 41 (1908) (" 'There can be no doubt that every flowing back or throwing water upon the land of another is such an act as entitles the individual injured to his action' "), quoting *Stout v. McAdams*, 3 Ill. 67, 69 (1839). But it would be unreasonable to acknowledge riparian rights based solely on the developer's error. Such an outcome would be inequitable to the developer and, as importantly, would upset the settled expectations of all the other people involved in the development. See generally *Anderson*, 433 So. 2d at 1205-06 (noting that the immediate recognition of riparian rights in land that has been overflowed would create a general disincentive to improve property with artificial bodies of water).

Finally, we note that rights to artificial bodies of water may arise by means other than the riparian rights doctrine, such as grants, easements by prescription, or easements by implication (see, *e.g.*, *Roketa v. Hoyer*, 327 Ill. App. 3d 374 (2002)). The Aldersons do not contend, however, that any of these other means are applicable in this case.

Conclusion

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*