NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230034-U

NO. 4-23-0034

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 30, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| EARL C. BULL JR., as Trustee of the Earl C. Bull Jr. Trust Dated February 1, 2013, | ) ) | Appeal from the Circuit Court of |
|     Petitioner and | ) | Fulton County |
|     Counterrespondent-Appellee, | ) | No. 19MR102 |
|     v. | ) | |
| CHRISTOPHER HUMMEL and AARON D. JACOBUS, | ) | Honorable |
|     Respondents and | ) | Nigel D. Graham, |
|     Counterpetitioners-Appellants. | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice DeArmond and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding that there was not a proven right to access the entire surface of a manmade body of water located mostly on the adjoining landowner's property and that the "artificial-becomes-natural" exception did not apply to this case.

¶ 2    Following a bench trial in the circuit court of Fulton County, the trial court held that respondents/counterpetitioners Christopher Hummel and Aaron D. Jacobus (respondents) failed to establish an easement by implication based on preexisting use of a manmade body of water (artificial lake) located mostly on the adjoining property of petitioner/counterrespondent the Earl C. Bull Jr. Trust (petitioner) and that the "artificial-becomes-natural" exception did not apply to confer riparian rights in favor of respondents.

¶ 3    On appeal, respondents argue that they (1) established an implied easement on the basis of preexisting use of the artificial lake by the prior owner, and, alternatively, (2) were entitled to full riparian rights to the use of the entire body of water under the "artificial-becomes-natural" exception. We affirm.

¶ 4                I. BACKGROUND

¶ 5    This case concerns the right to use an artificial body of water that lies across two adjacent parcels, each owned by one of the parties to this appeal. Beginning in the early-to-mid-1970s, the adjacent parcels were owned by various entities (mining company) which strip-mined the land, creating a depression. As stipulated by the parties, during the mid-1980s, the depression filled with water, thereby creating the body of water at issue in this case. The artificial lake, which covers roughly 52 acres, is located on both parcels, although most of the water is situated on the northern parcel. Each parcel has roughly 30 acres of tillable land used for farming.

¶ 6    A map excerpt, taken from petitioner's exhibit AA, shows the property line in relation to the artificial lake. The Bull Property is located north of the property line intersecting the lake; the Hummel-Jacobus Property is located south of the property line:



¶ 7                                    A. Ownership of the Parcels

¶ 8            The mining company originally purchased the northern parcel in June 1971 and acquired the southern parcel in December 1976.

¶ 9            In March 2012, the northern parcel (roughly 80 acres) was sold to Earl C. Bull Jr. (Bull), who subsequently transferred the parcel into a trust, of which Bull serves as its trustee. The parties have referred to this parcel as the Bull Property. The mining company sold the southern parcel (roughly 80 acres) to Doneita M. Werry in October 2018, who then sold it to respondents in December 2018. This parcel is referred to as the Hummel-Jacobus Property. The parties stipulated that each owned a portion of the lakebed underneath the artificial lake.

¶ 10                                   B. Nature of The Dispute

¶ 11           Shortly after respondents purchased the Hummel-Jacobus Property, respondent Christopher Hummel called Bull and advised him of their purchase and that they "would be using the water" on both properties. Petitioner responded that he did not allow any fishing on the artificial lake. Shortly after that discussion, respondents built a boat ramp made of white rock on their property at the southeast corner of the artificial lake. In 2019, respondents began fishing on the entirety of the artificial lake; specifically, Christopher Hummel allowed his son and father to fish on the lake. Petitioner saw Hummel's relatives using the artificial lake and informed Hummel they could not access his property to use the lake or use the surface of the water on his property. According to Earl Bull, "I *** told him that I didn't want anybody on our portion of the lake." Respondents maintained that they were entitled to reasonable use of the entire surface of the body of water.

¶ 12           Petitioner filed a complaint against respondents in July 2019. Count I sought a declaratory judgment "with regard to the rights of the parties to access and use the surface of the

water" located on the petitioner's property. Count II requested a preliminary injunction against respondents "from allowing any persons to enter thru their property for the purpose of encroaching on the property of the Petitioner." Respondents filed a counterclaim seeking a declaration that they could use the entire surface of the artificial lake.

¶ 13                            C. Preliminary Injunction and Summary Judgment

¶ 14        In December 2020, the trial court entered a preliminary injunction enjoining respondents from "using the surface of the water on land" owned by petitioner. It does not appear that an appeal was filed from that order.

¶ 15        The parties filed cross-motions for summary judgment, which were denied. The case proceeded to a bench trial in July 2022.

¶ 16                                    D. Trial

¶ 17        The following facts are gleaned from the testimony and exhibits introduced at trial.

¶ 18            1. *Deeds and the Parties' Understandings Upon Purchase*

¶ 19        None of the deeds in this case—whether related to the transfer from the mining company to Bull and the Werrys or the subsequent transfers from those individuals to petitioner and respondents—make any references to the artificial lake or access rights to it. Bull testified that when he purchased the property from the mining company, no one told him that anyone else had the right to use the artificial lake on his land. His son, James Bull, testified that when his father purchased the land, "we had purchased the property for our family's use, and we didn't want *** anybody else using the property." Bull also owned an artificial lake to the west of the property in litigation, which he allowed others (including respondents) to use. The son also believed that, prior to respondents purchasing the land, the Bull family could access the whole surface of the body of

water even though his father did not own it all. Respondents believed they, too, could access the entire water's surface and were aware of no access restrictions.

¶ 20 All parties acknowledged that allowing access to the artificial lake from the Hummel-Jacobus Property would benefit respondents' parcel.

¶ 21 *2. Usage of the Body of Water*

¶ 22 The parties stipulated that the strip-mining operations conducted on the parcels during the 1970s and early 1980s created a depression on the parcels, which filled with water at some point in the mid-1980s; the water has remained. At some point in the 1980s, the mine stocked the artificial lake with fish, something they frequently did as part of their postmining land reclamation efforts. There was evidence that the mining company placed "no trespassing" signs around the lake, but there were no restrictions as to use of the entire surface by those using the body of water.

¶ 23 a. Use by Others, Mid-1980s Through 2012

¶ 24 The evidence at trial showed that the mining company allowed certain individuals to fish on the artificial lake beginning in the mid-1980s. One of these individuals was Cory Schoonover, whose father worked for the mining company at the time. Schoonover personally fished on the water about 10 times and said that others did, too. He said the mining company began taking clients, customers, and employees to the artificial lake to fish and even had a lodge about four miles away where visitors could stay during fishing trips to the mining company's various lakes in the area. He took people to the lake about five times during the mid-to-late-1990s for the company. Schoonover said it was "common knowledge" that the mining company allowed its customers, clients, and employees to fish on the entire lake surface. The fishing was curtailed somewhat in the 2000s but continued in some form until petitioner purchased the parcel in 2012.

¶ 25          Mitch Hitchcock fished on the artificial lake during the late 1990s and early 2000s with the permission of the mining company. Hitchcock owned a scrap metal company that did business with the mining company. He testified that he fished on the entire body of water and that there were no restrictions on his use of the water's surface. He last fished on the water in roughly 2001-02.

¶ 26          Cooper Johnson, a relative of the Werry family who owned the Hummel-Jacobus Property prior to it being purchased by the mining company in the mid-1970s, said he openly fished on the artificial lake about every other week in the late 1980s and early 1990s with the mining company's permission.

¶ 27                              b. Water Use After 2012

¶ 28          Bull did not know who, if anyone, used the water prior to his purchase in 2012, although he understood the mining company restricted access to only those whom it permitted. According to Bull, only one individual from the mining company fished on the lake from the time he purchased it until the mining company sold the southern parcel to the Werrys in 2018. He testified that from 2012 until 2018, he knew of no one else using the artificial lake without his permission or that of his son, James. James acknowledged that he had permitted some individuals to use the artificial lake. Bull also said that the Werrys, who owned the Hummel-Jacobus Property before respondents, had never asked to fish in or use the artificial lake, and further, that he never discussed the issue with them.

¶ 29          Respondents had farmed the Hummel-Jacobus Property as tenant farmers since 2016, and Jacobus had tenant farmed it since 2011. Jacobus had never been on the lake prior to the time he purchased the Hummel-Jacobus Property. Hummel said he had been given permission by the Werrys to use the artificial lake. When respondents purchased the parcel, there was no direct

access to the water from the Hummel-Jacobus parcel due to foliage along the lake's southern edge. Shortly after Bull denied respondents the use of his access ramp (located on the Bull Property), respondents cleared an area on their land and constructed a rock-covered boat ramp at the southeastern corner of the artificial lake.

¶ 30          John Heimerdinger, president of the Lone Dog Hunting Club, testified that his club had an oral contract with Bull to hunt on the Bull Property. The club, which had about 12 members, hunted ducks from the end of October through January from various blinds located around the artificial lake and also used the surface of the water to access their blinds and to retrieve decoys. Bull claims he told Heimerdinger not to use the southeast corner of the lake—the portion owned by respondents—because it was not his land. His son James recalled being present for this conversation, but Heimerdinger denied that he was told not to use any part of the water. Bull was impeached with his deposition, where he testified that he had not told the club that they could not go onto the Hummel-Jacobus Property. After insisting he had actually told Heimerdinger, Bull was confronted with the statement in his deposition, "I never told them that they couldn't, but I assumed they wouldn't." Bull responded, "Maybe I misunderstood the question at that time."

¶ 31                                        E. Judgment

¶ 32          Following a bench trial, the trial court entered judgment in favor of petitioner and against respondents and found that respondents did not have the right to access the body of water on petitioner's parcel.

¶ 33          This appeal followed.

¶ 34                                        II. ANALYSIS

¶ 35          The issue before this court is whether respondents have the right to full access of the surface of the artificial lake overlapping their property and that of petitioner. The body of water

is an artificial lake and not naturally occurring, as it was created as a result of strip mining in the 1970s and early 1980s. Consequently, riparian rights generally do not apply. See, *e.g.*, *Alderson v. Fatlan*, 231 Ill. 2d 311, 320-21 (2008) (stating riparian rights do not generally apply to an artificial body of water); *Nottolini v. La Salle National Bank*, 335 Ill. App. 3d 1015, 1019 (2003) (same).

¶ 36    Respondents contend that the trial court erred in entering judgment in favor of petitioner and that they should be entitled to reasonable use and enjoyment of the entire surface of the water. They further argue that they established an implied easement from preexisting use by the mining company and, alternatively, that the "artificial-becomes-natural" exception applies, thus conferring upon them riparian rights to use the entirety of the artificial lake. According to respondents, the court's factual findings concerning its ruling on easement by implication are against the manifest weight of the evidence, and it misapplied the "artificial-becomes-natural" exception.

¶ 37    Our inquiry requires a two-step analysis. See *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 17. First, the trial court's underlying factual findings are reviewed deferentially. A trial court's findings of fact will not be disturbed on review unless those findings are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). Second, the trial court's conclusions of law are reviewed *de novo*. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 154 (2005). A *de novo* review gives no deference to the trial court's decision. *Shulte*, 2013 IL App (4th) 120132, ¶ 17.

¶ 38    With these standards of review in mind, we now review the merits of this appeal.

¶ 39            A. Implied Easement by Preexisting Use

¶ 40    An easement implied from a prior existing use "arises when an owner of an entire tract of land or of two or more adjoining parcels, after employing a part thereof so that one part of

the tract or one parcel derives from another a benefit or advantage of an apparent, continuous, and permanent nature, conveys or transfers part of the property without mention being made of these incidental uses." *Granite Properties Ltd. Partnership v. Manns*, 117 Ill. 2d 425, 436 (1987). According to *Granite Properties*, "[i]n the absence of an expressed agreement to the contrary, the conveyance or transfer imparts a grant of property with all the benefits and burdens which existed at the time of the conveyance of the transfer, even though such grant is not reserved or specified in the deed." *Id.*

¶ 41 The Illinois Supreme Court has held that an easement implied from a preexisting use is established by proof of three elements:

> "[F]irst, common ownership of the claimed dominant and servient parcels and a subsequent conveyance or transfer separating that ownership; second, before the conveyance or transfer severing the unity of title, the common owner used part of the united parcel for the benefit of another part, and this use was apparent and obvious, continuous, and permanent; and third, the claimed easement is necessary and beneficial to the enjoyment of the parcel conveyed or retained by the grantor or transferrer." *Id.* at 437.; see, *e.g.*, *People ex rel. Helgeson v. Hackler*, 21 Ill. 2d 267, 270 (1961).

A party claiming an easement "bears the burden of proof to demonstrate facts necessary to create an implied easement and such proof must be made by clear and convincing evidence." *Katsoyannis v. Findlay*, 2016 IL App (1st) 150036, ¶ 28.

¶ 42 Here, the trial court found that the first element had been satisfied because both parcels were once owned by the mining company. It further found that respondents had satisfied the first portion of the second element: that "before the conveyance or transfer severing the unity

of title, the common owner used part of the united parcel for the benefit of another part." *Granite Properties*, 117 Ill. 2d at 437. According to the trial court, this aspect was met because the mining company stocked the entire artificial lake with fish and, according to the testimony, "used the entirety of the water for fishing." These findings are not challenged on appeal. Respondents contend, however, that the trial court's findings on the remaining elements are against the manifest weight of the evidence.

¶ 43 The trial court found that the use of the body of water was not "apparent and obvious, continuous, and permanent." Specifically, the court observed:

"The testimony of several witnesses was that the mine allowed invitees to fish on the body of water from the mid 1980s [*sic*] until on or around severance of the parcel in 2012. This policy of allowing invitees to fish was described as 'common knowledge' but no context was really given as to whom this knowledge was common—in the farming community, the mining community, or in the community at large? The other unanswered question is how frequently the invitees of the mine were fishing on the property. This would be relevant to whether the use was obvious and continuous."

¶ 44 We conclude that there was sufficient evidence in the record from which the trial court could make these factual findings. Although there was testimony that the mining company allowed various individuals—employees, customers, clients, vendors, and state politicians—to fish on the artificial lake, there was little evidence as to how frequently these uses occurred during the roughly 25-year span from the mid-1980s through 2012, when the mining company sold the northern parcel to petitioner. It is undisputed that the body of water was not open to the public (*i.e.*, the mining company restricted who could use it).

¶ 45        It is the province of the trier of fact "to make reasonable inferences from established facts, and such permissible inferences will not be discarded by a reviewing court because other inferences might have been drawn from such established facts, unless the inferences drawn are unreasonable." *Zahn v. Muscarello*, 336 Ill. App. 188, 194 (1948). A conclusion is against the manifest weight of the evidence if the opposite conclusion is apparent from the record, or if the finding is unreasonable, arbitrary, or not based on the evidence. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 46        Given respondents' failure to satisfy this portion of the second element, they cannot establish an easement by implication. Additionally, there are adequate factual findings sufficient to show respondents have failed to prove the third element: that the prior use of the artificial lake was permanent and that the claimed easement was "necessary and beneficial to the enjoyment" of the Hummel-Jacobus Property. Regarding the former, there was no evidence that the mining company intended to create a permanent right of use of the artificial lake for both parcels at the time of severance. See, *e.g.*, *Granite Properties*, 117 Ill. 2d at 438 (citing Restatement (First) of Property § 476 (1944)); see also *Roketa v. Hoyer*, 327 Ill. App. 3d 374, 378 (2002). Regarding the latter, there was evidence that the parcels were primarily farm properties (and used as such by the parties). As the trial court observed:

> "If the only use for [r]espondents' property was fishing, the finding that the use of the entire body of water was necessary for the benefit and enjoyment of the parcel may be at issue. However, the evidence presented is that the vast majority of the [r]espondents' tract is tillable farm ground."

¶ 47　　　　According to the trial court, respondents "had leased and farmed that ground prior to purchasing the property," and as such, they "were aware of what it produced," and as a result, respondents could not establish the third element of an implied easement.

¶ 48　　　　We conclude that each of these factual findings is supported by the record and is not contrary to the manifest weight of the evidence.

¶ 49　　　　We note that respondents have cited *Roketa* for the proposition that an implied easement can be established where it is necessary and beneficial to the owner's enjoyment of the land. According to respondents, the record shows unequivocally that access to fish on the full body of water would benefit the Hummel-Jacobus parcel. While this point seems unanimous among the parties, we nevertheless find *Roketa* factually distinguishable from the instant case and decline to apply it.

¶ 50　　　　In *Roketa*, the recreational use of the lake prior to the defendants' acquisition of the property was "established" and "visible to anyone dealing with the property." Moreover, the prior owners owned "the entire estate, including the man-made lake" and it was "evident that the lake was created to benefit the land which surrounded it." *Roketa*, 327 Ill. App. 3d at 378. The same is not true here for two reasons. First, the trial court found that respondents failed to establish that the mining company's use of the artificial lake for fishing when it held title to both parcels was "apparent and obvious, [and] continuous." This factual finding can only be set aside if it is against the manifest weight of the evidence (*Eychaner*, 202 Ill. 2d at 251), and we have already concluded that it was not.

¶ 51　　　　Second, the trial court concluded that the lake here was created "incidental to mining activity." Thus, it cannot be said that the mine's "creation" of the lake as a byproduct of its strip-mining work was its intended purpose. Although the mine allowed individuals to fish on

- 12 -

the lake, this use was incidental to the parcel's primary function as mining property, and later as farmland. These facts stand in stark contrast to those in *Roketa*, where the original owner divided the land surrounding the lake into tracts with the intent that the tracts would benefit from the recreational use of the lake. See *Roketa*, 327 Ill. App. 3d at 378; *cf. Koubenec v. Moore*, 399 Ill. 620, 625 (1948) ("[W]here the owner of an entire estate has arranged and adapted it so that one tenement or one portion of the estate derives a benefit or advantage from the other, of a permanent, open and visible character, and then sells the same, the purchaser takes the tenement or portion sold with all the benefits and burdens which appear at the time of the sale to belong to it.").

¶ 52       Equally so, the trial court determined it was not the mining company's intention at the time of severance of the two parcels in 2012 to create a permanent right of use for both parcels to the entirety of the lake. See, *e.g.*, *Granite Properties*, 117 Ill. 2d at 438 (citing Restatement (First) of Property § 476 (1944)); see also *Roketa*, 327 Ill. App. 3d at 378. The court's conclusion on this point is supported by Schoonover's testimony that the mine did not use the lake after the sale to Bull in 2012 despite the mining company retaining ownership of the southern parcel. As we have explained, these findings are not against the manifest weight of the evidence.

¶ 53       Even if we were to apply *Roketa*'s holding, that case concerned the *third* element for creating an implied easement—that the claimed easement to fish on the entire lake surface is necessary and beneficial to the respondents' enjoyment of their property. Reaching the same conclusion here as in *Roketa* does not alter the trial court's ultimate conclusion that respondents failed to satisfy portions of the second element of the *Granite Properties* test, namely, that the use of the artificial lake for fishing was "apparent and obvious, continuous, and permanent." *Granite Properties*, 117 Ill. 2d at 437.

¶ 54       For these reasons, *Roketa* is not helpful to respondents.

¶ 55        Finally, respondents argue the trial court erred as a matter of law by intermixing the elements of an implied easement with the equitable remedy imposed by the "artificial-becomes-natural" exception. Although the trial court referenced a nonspecific "equitable argument" when it discussed the third element of an implied easement, it nonetheless made relevant factual findings. The court found that the portion of water on respondents' parcel was "considerably smaller" than the portion on petitioner's land. It also found that the primary use of respondents' land was farming, not fishing, and that respondents were aware of that use when they purchased the property due to their prior tenant farming of it. Each of these factual findings is supported by the record.

¶ 56        We conclude that the trial court's reference to "equitable arguments" in its implied easement analysis, even if slightly misplaced, does not detract from the correctness of its analysis. Even if it was error, it did not affect the outcome of the trial and did not in any way prejudice respondents. See, *e.g.*, *Fellows v. Barajas*, 2020 Il App (3d) 190388, ¶ 16 ("Where it appears an error did not affect the outcome of the trial, or where the reviewing court can see from the entire record that the error did not result in substantial prejudice, the judgment will not be disturbed." (citing *Cairns v. Hansen*, 170 Ill. App. 3d 505, 511 (1988))).

¶ 57        For these reasons, we conclude that the trial court's finding that respondents failed to establish an implied easement is not against the manifest weight of the evidence.

¶ 58                    B. Artificial-Becomes-Natural Exception

¶ 59        Respondents argue that the "artificial-becomes-natural" exception applies to this case and confers upon them general riparian rights, *i.e.*, full use of the surface of the body of water in question. According to respondents, the trial court misapplied this exception by failing to consider the artificial lake's use by the mining company during its prior ownership of both parcels.

Respondents urge us to review this issue *de novo*. See, *e.g.*, *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 26.

¶ 60 Generally speaking, the law respecting riparian rights provides that, "where there are multiple owners of the bed of a private, nonnavigable lake, such owners and their licensees have the right to the reasonable use and enjoyment of the surface waters of the entire lake" so long as they do not "unduly interfere with the reasonable use of the waters by other owners and their licensees." *Beacham v. Lake Zurich Property Owners Ass'n*, 123 Ill. 2d 227, 232 (1988). However, riparian rights "do not extend to artificial bodies of water, such as man-made lakes." *Nottolini*, 335 Ill. App. 3d at 1019. It is well settled that a water-filled quarry is not a lake because it is "not a natural body of water existing in a natural depression in the earth." *Id.* at 1018. Here, the parties have stipulated that the body of water is manmade, and thus, general riparian rights do not attach.

¶ 61 Under the "artificial-becomes-natural" exception, " ' "[a]n artificial waterway or stream may, under some circumstances, have the characteristics and incidents of a natural watercourse," ' " and, thus, be afforded riparian rights. *Alderson*, 231 Ill. 2d at 320-22 (quoting *Saelens v. Pollentier*, 7 Ill. 2d 556, 561-62 (1956), quoting 56 Am. Jur. 2d Waters § 151). According to *Saelens*, one of the first Illinois decisions to address this exception:

> " 'An artificial waterway or stream may, under some circumstances, have the characteristics and incidents of a natural watercourse. In determining the question, three things seem generally to be taken into consideration by the courts: (1) whether the way or stream is temporary or permanent: (2) the circumstances under which it was created; and (3) the mode in which it has been used and enjoyed. Where the way is of a permanent character, and is created under circumstances indicating an intention that it shall become permanent, and it has been used

- 15 -

consistently with such intention for a considerable period, it is generally regarded as stamped with the character of a natural watercourse, and treated, so far as the rules of law and the rights of the public or of individuals are concerned, as if it were of natural origin.' " *Saelens*, 7 Ill. 2d at 561 (quoting 56 Am. Jur. Waters § 151).

¶ 62    Thus, where the usage of an artificial body of water has long been settled, "it may be appropriate to treat the artificial body as the legal equivalent of a natural one." *Alderson*, 231 Ill. 2d at 322.

¶ 63    As a minimum requirement, cases applying the "artificial-becomes-natural" exception "have done so only in situations where the party invoking the rule has relied upon use of the artificial body of water without dispute for a lengthy period of time." *Id.* at 323; see *People ex rel. T-Mobile USA, Inc. v. Village of Hawthorn Woods*, 2012 IL App (2d) 110192, ¶ 42. Indeed, *Alderson* points to two prior supreme court decisions where the exception was applied, but the invoking party had shown undisputed use for many decades. See, *e.g.*, *Saelens*, 7 Ill. 2d at 559 (more than 50 years of uncontested use), and *Gough v. Goble*, 2 Ill. 2d 577, 580 (1954) (more than 40 years of uncontested use).

¶ 64    Here, the trial court concluded that the "artificial-becomes-natural" exception did not apply because respondents failed to prove that they or their predecessors in title had relied upon use of the entire artificial lake surface without dispute for any significant length of time. In reaching this conclusion, the court assessed three time periods: (1) respondents' time of ownership; (2) the Werrys' ownership; and (3) that period of time when the two parcels were owned by the mining company.

¶ 65    As to the period of respondents' ownership, the trial court observed that "the dispute began shortly after the invoking party, the [r]espondents, purchased their property" in late

2018, when respondents were informed by Bull they could not access the entirety of the artificial lake. The undisputed facts show that the controversy concerning respondents' use of the water surface began *almost immediately* after respondents purchased the parcel in late 2018. This conclusion is not against the manifest weight of the evidence.

¶ 66    As to the period of the Werrys' ownership, the trial court found that there was "no indication that [the Werrys] ever used the water." Indeed, a similar situation occurred in *Alderson*, where the new owners attempted to rely on the prior owner's usage of the artificial lake but failed to introduce any evidence of such usage. *Alderson*, 231 Ill. 2d at 323; see *Bohne v. La Salle National Bank*, 399 Ill. App. 3d 485, 503 (2010) (noting that *Alderson* simply found that the "artificial-to-natural" exception did not apply because the Aldersons had not demonstrated their uncontested use of the quarry for a sufficient length of time). There the court found that "the Aldersons [could not] add the period of time the McElvains used the lake to their own as there is nothing in the record to indicate that anyone from the McElvain family ever made use of the lake." *Alderson*, 231 Ill. 2d at 323. Similarly, in this case, although Christopher Hummel testified that the Werrys had given him permission to use the entire lake surface, there is no evidence—even assuming his statement is accurate—that petitioner was aware of such use. Thus, the trial court could rightly conclude the purported use was not "undisputed."

¶ 67    Finally, the trial court found that the mining company's common ownership of the properties meant that its use of the property could not be considered in this context. We agree that the mining company's use of its own property can be neither "disputed" or "undisputed." *Alderson* implicitly considers situations where the use might be disputed but was not. Here, because the mining company was a common owner of the two parcels, it is a meaningless exercise to consider whether it disputed its own use of the property. We therefore agree with the trial court that such

- 17 -

evidence was "not relevant" to the *Alderson* analysis. Consequently, the period of the mining company's unified ownership of both parcels cannot factor into the question "undisputed use" for purposes of the "artificial-becomes-natural" exception.

¶ 68    We conclude that the trial court committed no error of law in applying and interpreting *Alderson* and that the court's factual findings concerning possible application of the "artificial-becomes-natural" exception are not against the manifest weight of the evidence.

¶ 69    We affirm trial court's judgment in favor of petitioner.

¶ 70                          III. CONCLUSION

¶ 71    For the reasons stated, we affirm the trial court's judgment.

¶ 72    Affirmed.